**TRUST NO. 5522 AND TRUST NO. 5644, BELLEHURST SYNDICATE et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 7513.

Circuit Court of Appeals, Ninth Circuit.

May 14, 1936.

M. F. Mitchell and George G. Witter, both of Los Angeles, Cal., for appellant.

Frank J. Wideman, Asst. Atty. Gen., and James W. Morris, Joseph M. Jones, and John P. Jackson, Sp. Assts. to Atty. Gen., for appellee.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

DENMAN, Circuit Judge.

Petitioner taxpayer is a trust which, on March 4, 1923, purchased a large tract of land in the city of Glendale, Los Angeles county, Cal. The declaration of trust provided for the creation and management of a subdivision project and the sale of lots in this tract. It was taxed on its income as an association resembling a corporation.

Its petition here seeks review of the decision of the Board of Tax Appeals, claiming error in sustaining the Commissioner of Internal Revenue in holding that taxpayer's payments to five individuals or their firms in the years 1928 and 1929 were not in payment for services rendered by such individuals from March 4, 1923, to 1930, in the development of the subdivision and in its management in the successful disposition of the subdivided lots.

The trust instrument provided that the beneficiaries should pay in $100,000 to the trustee, for which they received one beneficial interest for each $500 invested. $50,000 of these contributions to the investment were to be paid by the trustee to the trustor, seller of the property to the trust, as a first installment of the purchase price, and $50,000 to be used in the starting of the development. The trust further provided that out of the collections from the sale of subdivisions of the property payments amounting to $600,000 were to be made to the trustor seller of the property; the original investment of $100,000 repaid to the beneficiaries, and a further $100,000 paid to them as profit on their investment. It then provides as follows:

"VII. * * * After the Beneficiaries have received the sum of One Hundred Thousand Dollars ($100,000.00), which amount has been agreed by them to be paid in to the Trustee under the terms hereof, plus an additional sum of One Hundred Thousand Dollars ($100,000.00), then the balance of such moneys distributed by the

Trustee shall be distributed as follows: fifty per cent (50%) thereof to the Beneficiaries and *fifty per cent (50%) thereof to E. P. Thom,* said E. P. Thom to take said sum *in addition* to whatever sums he may receive as one of the above named beneficiaries, it being understood that amounts expended upon the order of the Beneficiaries for improvements, taxes, commissions, expense of operation of trust and similar matters, shall not be deemed to be payments to the *Beneficiaries* under the terms hereof." (Italics supplied.)

Concerning this provision of the trust, it is claimed by the taxpayer that the 50 per cent. agreed to be distributed to E. P. Thom was to be paid as compensation for the six years and ten months managerial services rendered by Thom, the Syndicate Managers, and other persons, and that the performance of the agreement was an expense of administering the trust and hence in determining the taxable income a proper deduction from the gross income from the sale of the lots.

The Commissioner contends that in taxing the trust as if it were a corporation, the amount agreed to be paid to Thom and his associates from the lot sales should not be treated as a deduction because they were some of the beneficiaries under the trust. His contention to be supported must assimilate the payments to dividends to them, which came from profits previously earned by the association.

The findings of the Board which taxpayer claims are not supported by the evidence are:

"The petitioner claims as an ordinary and necessary expense deductions of $92,500 in 1928 and $57,700 in 1929, which it contends are reasonable allowances for compensation for services actually rendered by Thom, Leimert, Bates, Borland, Cotton, and Cooper. There is no evidence to show that these amounts were actually paid by the trust or that these parties received such amounts as compensation, or to show that if paid the respondent has disallowed them as deductions from gross income in the computation of the deficiencies. * * *

"The services of these several individuals were doubtless valuable and may not have been adequately compensated for otherwise, yet the plain language of the trust instrument does not show that these payments were made as compensation. * * *

"While under the terms of the trust agreement there was a liability to Thom for the 50 per cent of the profits, there was no provision for compensating him and his associates for any services to be rendered. * * *

"But in any event, we have not been shown the reasonableness of the claimed deductions."

Our analysis of the evidence leads us to the conclusion that it does not support these findings, but, on the contrary, that the taxpayer has shown the error claimed. Hence a reversal and return to the Board for its action is required. Briefly summarized, our conclusions are:

(1) That the trust instrument does not itself determine whether the agreed distribution to Thom and his assignees from proceeds contingent on success in managing the trust are a return for services or are given for some other reason unexplained in the instrument. This being true, we must look to the other evidence to determine the character of the distributions.

(2) The distribution was in fact made from the trust funds to those rendering managerial services and was not deducted by the Commissioner from the trust income of the years in question in determining the tax.

(3) The managerial services of both the Syndicate Managers created by the trust and other persons created a liability in the trust fund and in the beneficiaries for such services.

(4) The agreed Thom distribution was for such services and relieved the beneficiaries from the personal liability therefor otherwise existing, and hence was not similar to a dividend paid to a beneficiary from net income of the association.

(5) That *looking forward* from March 4, 1923, when the enterprise was formed, the agreement in the trust providing for such services was "reasonable," because it was only on the *contingency* that the enterprise might, in the course of years in which real estate subdivisions in Los Angeles county prospered and encountered none of its successive depressions, sell enough lots to pay all the expenses of development and sale, plus the $600,000 for the property, plus $200,000, that is 100 per cent. profit on the beneficiaries' investment.

The business of developing and subdividing properties in Southern California has been perfected during the past three or

four decades of immigration there. It appears that during the period of the administration of the Bellehurst development some 1,500 subdivision enterprises, held in trust by this single trust company, competed for the patronage of home builders. The success or failure of such enterprises rests on several factors: The selection of the particular tract with reference to the locus of population increase; the development of the tract with reference to its contours and streets, and the attractiveness of the arrangement of its subdivided lots; the installation of its drainage, sewerage, and lighting facilities; the landscaping and tree planting; the character of its water supply and its installation; the skill of its advertising; the satisfaction of prior purchasers as inducing others to become their neighbors; the technique of sales presentation; and the diplomacy in the pressure upon purchasers to make future purchase-price installments after the first down payments, without creating hostility against the management and increased sales resistence of new purchasers urged to join as neighbors to those already located. It would be difficult to find an enterprise in California in which the *services* of the managers play a larger factor in the success of the venture in comparison with the contribution thereto of the capital invested. Nevertheless, however great the skill, wisdom, and vigor of the management, their efforts may be defeated if the enterprise encounters "slump" rather than "boom" years.

■ The conclusion of the Board of Tax Appeals is in error in holding that there is no obligation created by the trust instrument to pay for such services. In addition to the $100,000 original investment, article IX of the trust provides that the beneficiaries agree to pay all taxes, assessments, and governmental charges and "also pay all *costs, charges and expenses in connection with the subdividing, platting, selling and conveying of said property,* * * * *to the end that* upon the sale of all the trust property the *Trustor shall receive not less than Six Hundred Thousand ($600,000.00) Dollars,* together with interest at the rate of six per cent (6%) per annum." (Italics supplied.)

These "costs, charges and expenses" in connection with the development of the property were expected to be paid from the receipts from the sales, article VII of the trust providing that out of the collections

made by the trustee the "amounts expended [by the Trustee] upon the order of the Beneficiaries for *improvements,* taxes, commissions, expense of operation of trust and similar matters, *shall not be deemed to be payments to the Beneficiaries* under the terms hereof." (Italics supplied.)

Under articles II and III the funds of the trust were to be administered by the trustee under the written directions of "any two of a Board of three of said Beneficiaries hereinafter called the 'Board of Syndicate Managers.'" The trustee was relieved from liability for actions done on the written directions of the Syndicate Managers and was under no obligation to perform any act except on their written direction. The final control of the whole enterprise of development and sale is thus given to this Board of Syndicate Managers.

The first members of this board were named in the trust instrument and consisted of H. H. Cotton, John T. Cooper, and H. W. Leimert. Provision was made for a substitution of Syndicate Managers, but since no substitution was made the provision is not relevant to the discussion. The important thing with reference to the trust provisions concerning them is that no specific provision is made for the compensation of the Syndicate Managers who had the final managerial responsibility for the administration of the enterprise.

■ That the beneficiaries would have been liable to the managers of the Syndicate for a reasonable compensation for these managerial services to the "association" taxpayer is obvious. The rule in California is, "In short, we see no reason here for withholding application of the rule announced in the case of Bassett v. Fairchild, 132 Cal. 637, 64 P. 1082, 52 L.R.A. 611, *to the effect that the presumption that certain corporate officers render their services gratuitously, in the absence of previous express contract, does not apply to onerous services, which could not reasonably be expected to be performed for nothing, although no compensation therefor is previously fixed; and in such cases there is an implied agreement to pay what the services are reasonably worth.*" (Italics supplied.) King v. Grass Valley, etc., Co., 205 Cal. 698, 699, 272 P. 290.

The fact that these managers were also beneficiaries cannot affect their claim for services rendered to all beneficiaries, including themselves. Managerial services

804

rendered by one who is also a vice president and an owner of half the corporate stock of a corporation entitles him to a compensation on an implied obligation. Corinne, etc., Co. v. Toponce, 152 U.S. 405, 14 S.Ct. 632, 38 L.Ed. 493. This court has held a manager, though president of a corporation and a 10 per cent. stockholder therein, entitled to compensation on such an implied obligation. Denman v. Richardson (C.C.A. 9) 292 F. 19. Also the beneficiaries would have been liable to any person assisting the Syndicate Managers in such managerial functions. As stated, the persons contributing proper management to a subdivision enterprise such as that of the Bellehurst are a major factor in its success.

We thus see that the trust instrument itself contemplates that the valuable contributions to the enterprise of the services of skilled and experienced persons, familiar with subdivision enterprises, are to be paid out of funds of the beneficiaries.

It appears from the Commissioner's statements incorporated in the record that in the years 1928 and 1929 the trust distributed the amount provided to be paid to Thom, to him and four other persons, the latter taking under assignments from Thom, and that the amount so distributed was treated as a profit included in gross income for those years. The board's finding to the contrary is not sustained by the evidence. Three of the four other than Thom were the trust managers and the fourth a firm of contractors. All rendered services not otherwise compensated.

Before this distribution to Thom under article VII providing for the payment contingent on gross profit, the enterprise had yielded $600,000 in full discharge of the purchase price of the property to be subdivided; $450,509.65 in improvement, expenses of sale, and operation of the enterprise; $100,000 to the beneficiaries as a return of their invested moneys; and a further $100,000 as a 100 per cent. profit on their investment.

The language of article VII providing for the payment to Thom contingent on the success of the management contrasts this payment with the distribution to the beneficiaries as a profit on their investment. After $600,000 is to be paid the trustor for the property, the provision is that:

"After the Beneficiaries have received the sum of One Hundred Thousand Dollars ($100,000.00), which amount has been agreed by them to be paid in to the Trustee under the terms hereof, plus an additional sum of One Hundred Thousand Dollars ($100,000.00), then the balance of such moneys distributed by the Trustees shall be distributed as follows: fifty per cent (50%) thereof to the Beneficiaries and fifty per cent (50%) thereof to E. P. Thom, said E. P. Thom to take said sum in *addition to whatever sums he may receive as one of the above named beneficiaries,* it being understood that amounts expended upon the order of the Beneficiaries *for improvements,* taxes, commissions, expense of operation of trust *and similar matters,* shall not be deemed to be payments to the Beneficiaries under the terms hereof." (Italics supplied.)

The contrast between profit in and return of investment and the Thom payment is clear. The latter payment has a meaning and intent different from the former. The difference is accentuated by provision that amounts paid for "improvements" under orders of the beneficiaries (through the managers under articles II and III) are not to be deemed payments to the beneficiaries. The evidence shows that the Thom payment came within this provision for payments other than those as to beneficiaries.

Obviously it does not follow, because the instrument provided that the sums distributed to Thom came *from* gross profitable operations of the association, that he *received* the distribution *as from a net profit* rather than *for services.* It could as well be urged that the managers of a corporation whose compensation was paid *from* moneys traceable to the gross profits of the corporation, received the payment as a dividend from net profit instead of as compensation for services. Here the amounts paid by the association to the several persons rendering the services bore no proportionate relation to their individual beneficial interests, and the total paid all bore no proportional relation to Thom's beneficial interest.

There is no evidence that the Thom group had any interest in the property sold and that the payment of the 50 per cent was a part of the purchase price. If it were, it would be a part of the cost of the land sold in subdivision and proper as a deduction from the sales income. In no sense would it then be a profit to the association.

There is no evidence that Thom and the Syndicate Managers were to have the payment as a profit arising from a promotion of the enterprise prior to the purchase for the beneficiaries. If it were such an agree-

ment, then also it would be a deduction from the gross profits of the association thereafter formed. It is significant that no attempt was made by the Commissioner to counter the taxpayer's affirmative showing that the trust provision to pay Thom was for services. He made no examination of Thom and his associates who testified to develop any other purpose for the agreed payment.

The evidence affirmatively shows that when the trust was formed an agreement was made between Thom, the sales manager, the contractors, and the Syndicate Managers that the contingent payment under article VII was for *future* services. As shown by the cases cited, the managers were entitled to compensation and they were authorized to make such an agreement for their own and other's services. True, if the agreement benefitting the managers were secret and kept from the other beneficiaries, it would be carefully scrutinized by this court. Here, however, the amount is expressed in the instrument itself and, as explained above, it relieved the other beneficiaries from a liability otherwise existing.

The Commissioner's brief argues the question of the reasonableness of the Thom agreement for a highly contingent payment for future services created in the trust instrument of March 4, 1923, as if we should apply the after wisdom of six years and ten months later. He admits that the payees rendered valuable services to the association which are not compensated otherwise than by the Thom payment. He would have us forget the hazards of the contingencies of real estate speculation in Southern California and ignore the likely possibility that even with good times the enterprise would not yield the $1,050,509.65 expended for the land, and improvements, and the conduct of the enterprise, plus the 100 per cent. profit to the beneficiaries.

The board's decision is that there was no agreement for compensation and none paid. It therefore had no occasion to make any finding as to what was a reasonable compensation. Since the evidence of the instrument itself and the testimony of the witnesses show that a contingent contract for the payment for services existed and that payments were made thereunder, and since the Commissioner offered no showing a deduction should not be made, the board is required to find not only whether the payments actually made were reasonable,

but, if not, what reasonable portion thereof shall be allowed as a deduction. In making such findings the board should do so in view of the contingency and other considerations stated in the opinion.

Reversed.